1  Benjamin M. Lopatin, Esq.
2  Cal. Bar No.: 281730
   *lopatin@hwrlawoffice.com*
3  **THE LAW OFFICES OF**
   **HOWARD W. RUBINSTEIN, P.A.**
4  One Embarcadero Center, Suite 500
5  San Francisco, CA 94111
   (800) 436-6437
6  (415) 692-6607 (fax)

7  (Additional Counsel appear on signature page)

8
   <u>Attorneys for Plaintiff, Julie Martin</u>
9

10          **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**

11 **JULIE MARTIN**, as an individual, and on    : Civil No. C 12    4846
12 behalf of all others similarly situated,      :
                                                 : **CLASS ACTION COMPLAINT FOR:**
13                                               :
14     *Plaintiff,*                              : 1.  Violations of Cal. Bus. & Prof. C. §§ 17200,
                                                 : *et seq.*;
15                                               : 2.  Violations of Cal. Bus. & Prof. C. §§ 17500,
16 *vs.*                                         : *et seq.*;
                                                 : 3.  Violations of Cal. Civ. C. §§ 1750, *et seq.*;
17                                               :
18 **THE KELLOGG COMPANY**, a Delaware          : *Jury Trial Requested*
   corporation, and **KASHI COMPANY**, a        :
19 California corporation,                       :
                                                 :
20     *Defendants.*                             :

21

22      Plaintiff, JULIE MARTIN, by and through her undersigned counsel, and pursuant to all

23 applicable *Federal Rules of Civil Procedure*, hereby files this Class Action Complaint,

24 individually, and on behalf of all others similarly situated, and alleges against Defendants, THE

25 KELLOGG COMPANY and KASHI COMPANY—a subsidiary of the Kellogg Co.

26 (collectively referred to herein as "KELLOGG" or "Defendant"), as follows:

27

28

# I. INTRODUCTION

1.      Kellogg is the owner and manufacturer of a line of snack foods commonly known as "Kashi."   Defendant has represented that Kashi products are "ALL NATURAL," when in fact, they are not because they contains Genetically Modified Organisms ("GMOs"). Defendant manufactures, markets, advertises, distributes and sells various breakfast cereals, energy bars, crackers, frozen entrées including pizza and breakfast foods, as well as snack foods.  At issue here is the cereal product Go Lean Crunch® (the "Product").

2.      Defendant markets the Product as "ALL NATURAL."  Specifically on the rear labeling of the Product's packaging.  *See* **Exhibit 1**, attached hereto and incorporated herein, copy of rear label of the Product's packaging.

3.      Contrary to Defendant's representations, however, the Product uses plants grown from GMOs.[1]  *See* **Exhibit 2**, attached hereto and incorporated herein, copy of side label of the Product's packaging showing ingredient list.  Specifically, the Product contains Soy and/or Soy variations, among other ingredients, that are known to be derived from GMOs.

4.      GMOs are plants that grow from seeds in which DNA splicing has been used to place genes from another source into a plant.[2]

5.      The Product poses a potential threat to consumers because medical research and scientific studies have yet to determine the long-term health effects of genetically engineered foods.   Recent studies suggest that GMOs may in fact be harmful to a consumer's health.  For

---

1.      Dr. Mercola.  "The One and Only Way You Can Tell if a Food is GMO Free."  February 29 2012. *Mercola.Com. See* **Exhibit 3,** *attached hereto and incorporated herein.*

2.      Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; Pg. 4. **Exhibit 4,** *attached hereto and incorporated herein.*

example, an insecticidal toxin, known as BT toxin, is often inserted into the genetic code of an array of crops to enable the plant to produce its own insecticide.  This insecticide is released when insects ingest it.[3] Though BT toxin was supposed to be safe for humans (the digestion system in the human body was supposed to destroy it), more recent studies have shown that the human gut is actually not destroying it.[4]  Canadian researchers this year reported that the blood of ninety-three percent (93%) of pregnant women and eighty percent (80%) of their umbilical-cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though digestion was supposed to remove it from the body.[5]

6.     The Product also has the potential of harboring allergens not typically associated with the listed ingredients.   A person allergic to Brazil nuts, for example only, would be at risk of suffering an allergic reaction from consuming a product that contained a GMO bioengineered to contain DNA from Brazil nuts.  The consumer would be unaware of the potential allergic reaction because the product containing the GMO would in no way warn of or even indicate its genetically modified condition.

---

3.     Golberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.  http://livingmaxwell.com/monsanto-gmo-sweet-corn.

4.     Golberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.  http://livingmaxwell.com/monsanto-gmo-swet-corn.

5.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; Pg. 4. *See* **Exhibit** **4**; Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.  *See* **Exhibit 5,** *attached hereto and incorporated herein.*

7.     Plaintiff contends that products containing GMOs are not "all natural" and that Defendant's advertising and labeling is deceptive and likely to mislead the public as a result. Plaintiff would not have purchased the Product if she had known that the Defendant could not support their claim that the Product is all natural because it contains GMOs.[6]

## II. VENUE AND JURISDICTION

8.     This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under 28 U.S.C. § 1332(d), which, under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

9.     Plaintiff alleges that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).

10.     As set forth below, Plaintiff is a citizen of California, and KELLOGG can be considered a citizen of Delaware. Therefore, diversity of citizenship exists under CAFA, as required by 28 U.S.C. § 1332(d)(2)(A).

11.     Furthermore, Plaintiff alleges on information and belief that more than two-thirds of all of the members of the proposed Plaintiff Class in the aggregate are citizens of a state other

---

6.     Plaintiff do not argue that Defendant was required to state whether its Products were made from genetically modified plaints, as this issue would be pre-empted under the NLEA. Rather Plaintiff contend that Defendant's affirmative decision to label its Product "ALL

than California, where this action is originally being filed, and that the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

12.     Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(a) because, as set forth below, Defendant conducts business in, and may be found in, this district, and Plaintiff purchased the subject product of this action in this judicial district. The **"Declaration of Benjamin M. Lopatin, Esq., Pursuant to Civil Code §1780(c) of the Consumer Legal Remedies Act, Civil Code §§1750 et seq."** regarding venue under the California Consumer Legal Remedies Act ("CLRA") is submitted herewith and is incorporated herein by reference.

## II. PARTIES

13.     Plaintiff is an individual more than 18 years old, and is a citizen of California, who resides in the city and County of San Francisco. She respectfully requests a jury trial on damage claims. Plaintiff purchased Kashi Go-Lean Crunch cereal (the "Product") during the Class Period, and specifically during March of 2012, from a Trader Joes Market, located at 265 Winston Drive, San Francisco, California 94132.

14.     In purchasing the Product, Plaintiff saw and relied on the labeling and advertising for it displayed on the packaging. She has been damaged by her purchase of the Product because the labeling and advertising for the Product was and is false and/or misleading under California law; therefore, the Product is worth less than what Plaintiff paid for it and/or Plaintiff did not receive what she reasonably intended to receive. The labeling and advertising for the Product relied upon by Plaintiff was prepared and/or approved by KELLOGG and its agents, and was disseminated by KELLOGG and its agents through labeling and advertising containing the

_____

NATURAL" is misleading, given that the Products were made from Genetically Modified Organisms.

misrepresentations alleged herein. The labeling and advertising for the Product was designed to encourage consumers to purchase the Product and reasonably misled the reasonable consumer, i.e. Plaintiff and the Class.

15.    Defendant Kellogg Company ("Kellogg") is a Delaware corporation with its principal place of business located in the State of Michigan at One Kellogg Square, Battle Creek, Michigan 49017.  Kellogg lists with the Michigan Secretary of State a Registered Agent designated as The Corporation Company located at 30600 Telegraph Road, Suite 2345, Bingham Farms, Michigan 48025.  Therefore, Kellogg can be considered a "citizen" of the State of Michigan.  Defendant Kellogg also promoted and marketed the Product at issue in this jurisdiction and in this judicial district.

16.    KELLOGG is the owner, manufacturer and distributor of the Product, and is the company that created and/or authorized the false, misleading and deceptive labeling and advertising for the Product.  KELLOGG is the parent company and/or owner of KASHI CO., which maintains its principal place of business at 4275 Executive Square, Suite 500, La Jolla, California 92037-1477.

### III. FACTUAL ALLEGATIONS

17.    All allegations herein are based on information and belief and/or are likely to have evidentiary support after reasonable opportunity for further investigation and discovery.

18.    Plaintiff alleges that, at all times relevant herein, KELLOGG and its subsidiaries, affiliates, and other related entities, as well as their respective employees, were the agents, servants and employees of KELLOGG, and at all times relevant herein, each was acting within the purpose and scope of that agency and employment.

19.     Plaintiff further alleges on information and belief that at all times relevant herein, the distributors and retailers who delivered and sold the Product, as well as their respective employees, also were KELLOGG's agents, servants and employees, and at all times herein, each was acting within the purpose and scope of that agency and employment.

20.     Additionally, Plaintiff alleges that, in committing the wrongful acts alleged herein, KELLOGG, in concert with its subsidiaries, affiliates, and/or other related entities and their respective employees, planned, participated in and furthered a common scheme to induce members of the public to purchase the Product by means of false, misleading, deceptive and fraudulent representations, and that KELLOGG participated in the making of such representations in that it disseminated those misrepresentations and/or caused them to be disseminated.

21.     Whenever reference in this Complaint is made to any act by KELLOGG or its subsidiaries, affiliates, distributors, retailers and other related entities, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of KELLOGG committed, knew of, performed, authorized, ratified and/or directed that act or transaction on behalf of KELLOGG while actively engaged in the scope of their duties.

22.     Defendant manufactures, markets, advertises, distributes and sells various breakfast cereals; energy bars; crackers; frozen entrées including pizza and breakfast foods; as well as snack foods.  At issue here is the cereal Go Lean Crunch® (the "Product").

23.     Defendant markets the Product as "ALL NATURAL."  Specifically on the rear labeling of the Product's packaging.  *See* **<u>Exhibit</u> 1**.  Defendant's claim is misleading, however,

because Defendant's Product contains GMOs, ingredients that have been modified through biotechnology and are therefore not all natural.[7]

24.     Contrary to Defendant's representations, however, the Product uses plants grown from Genetically Modified Organisms ("GMOs").[8]  *See* **Exhibit 2**, attached hereto and incorporated herein, copy of side label of the Product's packaging showing ingredient list. Specifically, the Product contains Soy and/or Soy variations, among other ingredients, that are known to be derived from GMOs.

25.     The GMOs at issue are plants grown from seeds in which DNA splicing has been used to place genes from another source into a plant.  This gene splicing can be used to enable a certain crop to withstand a weed-killing pesticide, for example, or incorporate a bacterial toxin that can repel pests.[9]  This latter practice of incorporating bacterial toxin within a plant's genetic composition has been a particular cause of alarm among conscientious consumers. Canadian researchers this year reported that the blood of ninety-three percent of pregnant women and eighty percent of their umbilical cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though manufacturers of GMOs claim that digestion is supposed to remove it from the body. "Given the potential toxicity of these environmental

---

7.     *Id.*

8.     Dr. Mercola.  "The One and Only Way You Can Tell if a Food is GMO Free."  February 29 2012. Mercola.Com. *See* **Exhibit 3,** *attached hereto and incorporated herein.*

9.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.  *See* **Exhibit 5**.

pollutants and the fragility of the fetus, more studies are needed," they wrote in Reproductive Toxicology.[10]

26.     Other concerns that have been raised by environmental groups include the possibility that GMOs contribute to the spread of antibiotic resistance, and could introduce new allergens into foods.[11]  Concern surrounding the latter topic of allergens relates to two factors; the possibility that genes from known allergens may be inserted into crops not typically associated with allergenicity and the possibility of creating new, unknown allergens by either inserting novel genes into crops or changing the expression of endogenous proteins.[12] While the Food and Drug Administration (FDA) has allowed the sale and planting of genetically modified foods for 15 years,  the FDA wrote in a statement to the Tribune that " [u]ltimately, it is the food producer who is responsible for assuring safety,"  noting also that manufacturers are encouraged to consult with the agency about their products.[13]

27.     The European Union has recognized the potential dangers inherent in consuming genetically modified organisms and has some of the most stringent GMO regulations in the world.  In the European Union all GMOs are considered "new food" and subject to extensive,

---

10.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.  *See also*  Golberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.   http://livingmaxwell.com/monsanto-gmo-sweet-corn.

11.     Bakshi A (2003). "Potential adverse health effects of genetically modified crops". *J Toxicol Environ Health B Crit Rev 6* (3): 211–25.

12.     Key S, Ma JK, Drake PM (June 2008). "Genetically modified plants and human health". *J R Soc Med* 101 (6): 290–8.

13.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

case-by-case, science based food evaluation by the European Food Safety Authority (EFSA). The EFSA reports to the European Commission who then draft a proposal which if accepted will be adopted by the EC or passed on to the Council of Agricultural Ministers. [14] There is also a safeguard clause that Member States can invoke to restrict or prohibit the use and/or sale of a GMO within their territory if they have a justifiable reason to consider that the approved GMO constitutes a risk to human health or the environment.[15] In February 2008, for example, the French government used the safeguard clause to ban the cultivation of MON810 after Senator Jean-François Le Grand, chairman of a committee set up to evaluate biotechnology, said there were "serious doubts" about the safety of the product.[16] By 2010, the only GMO food crop with approval for cultivation in Europe is the GM maize MON810, and a second GMO, a potato called Amflora, was approved for cultivation for industrial applications in the EU by the European Commission.[17]  Despite the European Union's approval of MON 810, however, it has been banned for cultivation by Germany, Austria, France, Greece, Luxembourg, Poland and Bulgaria.  Meanwhile, Italy does not allow for the cultivation if GMOs.[18]

---

14.    Davison, J. (February 2010). "GM plants: Science, politics and EC regulations". *Plant Science* 178 (2): 94–98.

15.    European Commission. "Food Safety: From the farm to the fork (What are the National safeguard measures)". Europa.

16.    AFP – Feb 8, 2008 (2008-02-08). "AFP: French GM ban infuriates farmers, delights environmentalists."

17.    "European Commission approves Amflora starch potato - BASF - The Chemical Company - Corporate Website". BASF.  http://www.basf.com/group/pressrelease/P-10-179. Retrieved 2010-09-24.

18.    Barker, Debbie. "Part II: The Emperor has No Clothes." p. 37.

28.     In addition, independent scientific testing of the effects of GMOs on rats, hamsters, and mice have generated great concern as to the safety of GMOs. The tests have been conducted by: Dr. Irina Ermakova, the Institute of High Neural Activity and Neurophysiology of Russian Academy of Sciences, Moscow; Dr. Alexey Surov and Dr. Alexander Baranov, the Institute of Environmental and Evolution Problems and the Institute of Developmental Biology, Moscow); and Dr. Maria Konovalova, the Saratov Agrarian University. All three of these studies demonstrate significant biological and behavioral changes in the animals when GM soya or GM corn was put into their feed. Some of the biological effects include increased mortality among newborns in the first generation, reduced quantity of offspring, and spike in sterility among second generation animals. On the behavioral front, animals became more aggressive and lost maternal instincts.[19]

29.     Another study conducted by Dr. Arpad Pusztai the potential health risks that GMOs pose to internal organs.  Dr. Arpad Pusztai's research has shown that rats fed with GE potatoes had enlarged pancreases, their brains had shrunk, and their immunity had been damaged. Dr. Eric Seralini's research demonstrated that organ damage can occur.  In addition, the Committee of Independent Research and Information on Genetic Engineering (CRIIGEN) and universities at Caen and Rouen were able to get raw data of Monsanto's 2002 feeding trials on rats at the European Council order and made it public in 2005. The researchers found that rats fed with three approved corn varieties of GE corn—Mon 863, insecticide products, Mon 810, and Roundup Ready herbicide —suffered organ damage. The data "clearly underlines adverse impacts on kidneys and liver, the dietary, detoxifying organs as well as different levels

---

19.     Barker, Debbie. "Part II: The Emperor has No Clothes." P. 39.

of damages to the heart, adrenal glands, spleen and hematopoietic systems," according to Dr. Gilles Eric Seralini, a molecular biologist at the University of Caen.[20]

30.　　Additionally, evidence of liver and kidney toxicity appeared when rats were fed an approved GE maize variety (Mon 863) (Seralini GE, Cellier D. & Spironx de Vendomois, J, 2007, "New analysis of rat feeding study with a GM Maize", Archives of Environmental Contamination and Toxicology, 10,1007, S 00244-006-0149-5). Similar effects were observed when Monsanto fed its GT-73 Roundup Ready canola variety to rats. The rats showed a 12 percent to 16 percent increase in liver weight.[21]

31.　　Even the World Health Organization (WHO) cautions that "Different GM organisms include different genes inserted in different ways. This means that individual GM foods and their safety should be assessed on a case-by-case basis and that it is not possible to make general statements on the safety of all GM foods."[22]

32.　　More recently, Americans have also expressed a heightened concern about the safety of GMO products, as evinced by the fact that 14 states have currently introduced

---

20.　Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 17. "A Comparison of the Effects of Three GM Corn Varieties on Mammalian Health," Joel Spiroux de Veu de Mois, Francois Roullier, Dominique Cellise, Gilles Eric Serelini, *International Journal of Biological Science*s, 2009, 5: 706-726.

21.　Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 18. *See* Greenpeace (2004) "Greenpeace critique of Monsanto's Roundup Ready Oilseed rape, GT-73",*http://www.greenpeace.at/uploads/media/GT73_Greenpeace_comments_Oct_2004_01.pdf.*

22.　Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 19. *See* "20 Questions on Genetically Modified Foods." World Health Organization. *http://www.who.int/foodsafety/publications/biotech/20questions/en/.*

legislation on GMO labeling. Alaska, with its huge wild salmon industry, has already passed a

biotech seafood labeling law.[23]

33.     In addition,  polls taken by the Pew Center, Consumers Union, Harris Interactive

and ABC over the last decade that have consistently found that the vast majority of Americans

would like to see genetically modified foods better regulated and labeled.[24]

34.     Plaintiff contends that Defendant's failure to disclose the presence of GMOSs in

its Product amounts to a material misrepresentation.  Plaintiff would not have purchased  the

Product had she known it contains GMO.s

35.     Furthermore, in *Robert Briseno v. Conagra Foods,* Case No.:  CV 11-05379

MMM(AGRx), United States District Court for the Central District of California, Plaintiff

claimed that Defendant's decision to label its products 100% natural was misleading, given that

the products were made from genetically modified plants.  Though the judge acknowledged that

requiring an outright labeling of GMO was pre-empted, the judge nonetheless acknowledged

that the claim 'All-Natural' could be misleading to a reasonable consumer.   The Court

ultimately concluded that "a reasonable consumer could have been misled by the labeling,

marketing, and advertising at issue in this case." [25]

---

23.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare
sparks protests." Chicago Tribune. May 25, 2011.

24.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing
genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011.
BUSINESS; Business Desk; Part B; p. 4.

25.     *Robert Briseno v. Conagra Foods, Inc*, Case No.:  CV 11-05379 MMM(AGRx), United
States District Court for the Central District of California, *Tentative Order Granting Motion to
Dismiss*, p. 20 (CD California 2011). *See* **Exhibit 6,** *attached hereto and incorporated herein.*

36.     At a minimum, Plaintiff contends that Defendant should identify that the Product contains genetically modified ingredients.  Failure to is an omission of a material fact and violates a consumer's democratic right to information and choice.  Most people consider the decision of what they put into their bodies to be tremendously important.  People follow restricted diets for religious reasons (some observers of the Jewish faith keep Kosher, some observers of Muslim faith only eat Halal food, and some observers of Hindu faith refuse beef), for moral or personal reasons (many vegetarians and vegans restrict their diets for moral reasons), or because they physically cannot eat certain foods (those with celiac disease cannot eat wheat, those who are lactose intolerant cannot consume dairy products, and those with other food allergies face similar restrictions). In the latter scenario, eating the food in question could cause severe physical harm or death. In the first two scenarios, while the diets may be driven by personal choice rather than physical necessity, the beliefs behind the choices are often deeply held. If a Muslim eats soup that is labeled vegetarian but in fact contains pork, or if a vegetarian eats cereal that contains mouse parts, the mislabeling that led to the inadvertent consumption is likely to be extremely offensive.[26]  Likewise, Defendant's covert inclusion of GMOs in its Product amounts to an unlawful affront to the health conscious consumers and the public at large.

37.     As Wendell Berry Notes in her *Twelve Paragraphs on Biotechnology*, "[i]n biotechnology, as in any technology affecting living systems, there is nothing perfectly predictable. What we do within living bodies and in the living world is never a simple mechanical procedure such as threading a needle or winding a watch. Mystery exists;

---

26.     Valery Federici. "Genetically Modified Food and Informed Consumer Choice: Comparing U.S. and E.U. Labeling Laws." *35 Brooklyn J. Int'l L. 51 5* at 528.

unforeseen and unforeseeable consequences are common."[27]   Accordingly, Defendant's failure to disclose the presence of GMOs in its Product violates the consumer's right to know what is being introduced into his or her body/internal system, and right to choose whether he or she wishes to participate in the current experimental stage of genetically modified organisms and their comprehensive effect on human health.

### IV. CLASS ALEGATIONS

38.     Plaintiff re-alleges and incorporates by reference the allegations set forth *supra* in this Complaint.

39.     Plaintiff bring this class action pursuant Federal Rule of Civil Procedure 23 and seeks certification of the claims and certain issues in this action pursuant to the applicable provisions of Federal Rule of Civil Procedure 23, on behalf of all California persons who, within the four years preceding the filing of this Complaint ("Class Period") purchased the Product for personal use ("Class").

40.     Defendant's practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Class were and are similarly affected by having purchased and used the Product for its intended and foreseeable purpose, and the relief sought herein is for the benefit of Plaintiff and members of the putative Class.

41.     Plaintiff are informed and believe, and on that basis allege, that the Plaintiff Class is so numerous that joinder of all members would be impractical. Based on the annual sales of the Product and the popularity of the Product, it is apparent that the number of

consumers of the Product would at least be in the many thousands, thereby making joinder impossible.

42.    Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including, *inter alia*:

43.    Questions of law and fact common to the Plaintiff Class and any subclass exist that predominate over questions affecting only individual members, including, inter alia:

      a.    Whether Defendant's practices and representations related to the marketing, labeling and sales of the Product in California were unfair, deceptive and/or unlawful in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

      b.    Whether Defendant's practices and representations related to the marketing, labeling and sales of the Product in California were unfair, deceptive and/or unlawful in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17500 *et seq*.;

      c.    Whether Defendant violated Cal. Civ. Code §§ 1750 *et seq*. with its practices and representations related to the marketing, labeling and sales of the Product within California;

      d.    Whether Defendant failed to adequately warn of, and/or concealed the dangers and health risks associated with the Product; and

      e.    Whether Defendant's conduct as set forth above injured consumers and if so, the extent of the injury.

---

27.    Wendell Berry, "Twelve Paragraphs on Biotechnology." <u>The GMO Emperor has no Clothes</u>." p.43.

43.     The claims asserted by Plaintiff in this action are typical of the claims of the members of the Plaintiff Class, as the claims arise from the same course of conduct by Defendant, and the relief sought is common.

44.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Plaintiff Class.  Plaintiff have retained counsel competent and experienced in both consumer protection and class action litigation.

45.     Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims.

46.     Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class would be able to protect its own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

47.     Certification is also appropriate because Defendant acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.  Further, given the large number of consumers of the Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of this class action is appropriate under Cal. Civ. Code §1781, Cal. Code of Civil Procedure §382 and Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective members of the Class and any subclass predominate over questions of law or fact affecting only individual members.

48.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.

49.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

**V. FIRST CAUSE OF ACTION:**
**VIOLATIONS OF CAL. BUS & PROF. CODE §§ 17200 *ET SEQ.***

44.     Plaintiff re-alleges and incorporates by reference the allegations set forth *supra* in this Complaint.

45.     This cause of action is brought on behalf of Plaintiff and members of the general public pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*, which provides that "unfair competition shall mean and include any unlawful, unfair or deceptive business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

50.     Defendant has violated the Act by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.  Specifically, Defendant have represented that the Product is "ALL NATURAL," and failed to disclose and concealed the fact that the Product contains GMOs.

46.     Plaintiff alleges that Defendant committed unfair business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the deceptive labeling and advertising of the Product is negligible, if any, when weighed against the harm to the general public.

47.     The harmful impact upon members of the general public who purchased and used the Product outweighs any reasons or justifications by Defendant for the deceptive labeling and advertising practices employed to sell the Product that misleadingly claims to be "All Natural."

48.     Defendant had an improper motive (profit before accurate marketing) in its practices related to the deceptive labeling and advertising of the Product, as set forth above.

49.     The use of such unfair business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing, advertising and labeling of the Product.

50.     Defendant committed a deceptive act or practice by making the labeling and advertising representations set forth in detail above. These deceptive acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

51.     Defendant also committed an unlawful business practice by violating the FAL and CLRA as set forth in detail below. These violations serve as predicate violations of this prong of the UCL.

52.     As a purchaser and consumer of Defendant's Product, and as a member of the general public in California who purchased and used the Product, Plaintiff is entitled to and does bring this class action seeking all available remedies under the UCL.

53.     Defendant's labeling and advertising practices, as set forth above, were intended to promote the sale of the Product and constitute unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code § 17200 *et seq.*

54.     Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of herself and members of the general public, seeks an order of this Court requiring Defendant to restore to Plaintiff and other California purchasers of the Product all monies that may have been acquired by Defendant as a result of such unfair, deceptive and/or unlawful business acts or practices.

55.     Plaintiff and California purchasers of the Product will be denied an effective and complete remedy in the absence of such an order.

56.     As a result of Defendant's violations of the UCL, Plaintiff and California purchasers of the Product are entitled to restitution for out-of-pocket expenses and economic harm.

57.     Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the Product are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct.

58.     The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and California purchasers of the Product are entitled to interest in an amount according to proof.

## VI. SECOND CAUSE OF ACTION:
## VIOLATIONS OF CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.*

59.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

51.     In violation of California Bus. & Prof. Code § 17500, Defendant disseminated, or caused to be disseminated, the deceptive Product labeling and advertising representations that misleadingly claim that the Product is "ALL NATURAL," and failed to disclose and concealed the fact that the Product contains GMOs.

60.     Defendant's Product labeling and advertising representations are misleading because it cannot support its claim that the Product is "All Natural."

61.     Defendant's labeling and advertising representations for the Product are by their very nature unfair, deceptive and/or unlawful within the meaning of California Bus. & Prof. Code § 17500 et seq. The representations were likely to deceive reasonable consumers.

62.     In making and disseminating the deceptive representations alleged herein, Defendant knew or should have known that the representations were misleading, and acted in violation of California's Bus. & Prof. Code §§17500 *et seq.*

63.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and California purchasers of the Product have suffered substantial monetary and non-monetary damage.

64.     Pursuant to Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and other California purchasers of the Product, seeks an order of this Court requiring Defendant to restore to California purchasers of the Product all monies that may have been acquired by Defendant as a result of such unfair, deceptive and/or unlawful acts or practices.

65.     As a result of Defendant's violations of the FAL, Plaintiff and California purchasers of the Product are entitled to restitution for out-of-pocket expenses and economic harm.

66.     Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the Product are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct.

67.     The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and California purchasers of the Product are entitled to interest in an amount according to proof.

### VII. THIRD CAUSE OF ACTION:
### FOR VIOLATIONS OF CAL. CIV. CODE §§ 1750 *ET SEQ.*

68.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

69.     This cause of action is brought pursuant to Cal. Civ. Code §§ 1750 *et seq.*

70.     Plaintiff and each California purchaser of the Product are "consumers" within the meaning of Civil Code §1761(d).

71.     The purchases of the Product by Plaintiff and California purchasers of the Product were and are "transactions" within the meaning of Civil Code §1761(e).

72.     Defendant has represented that the Product is "ALL NATURAL," and failed to disclose and concealed the fact that the Product contains GMOs, which violated the CLRA in at least the following respects as set forth in detail above:

    a.  In violation of Civil Code §1770(a)(5), KELLOGG represented that the Product has characteristics, ingredients, uses, and benefits which it does not have; and

    b.  In violation of Civil Code §1770(a)(7), KELLOGG represented that the Product is of a particular standard, quality, or grade, which it is not.

c.   In violation of Civil Code §1770(a)(9), KELLOGG advertised the Product with an intent not to sell the Product as advertised;

d.   In violation of Civil Code §1770(a)(14), KELLOGG represented that the purchase of the Product confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

e.   In violation of Civil Code §1770(a)(16), KELLOGG represented that the subject of the sale of the Product has been supplied in accordance with a previous representation when it has not.

73.   Plaintiff seeks and is entitled to equitable relief in the form of an order requiring Defendant to make full restitution to California purchasers of the Product of all monies wrongfully obtained as a result of the conduct described above.

74.   Plaintiff, by and through counsel, on June 29, 2012, has notified Defendant, as required by statute, in writing, of the particular violations of Section 1770 of the CLRA, and has demanded that it take certain corrective actions within the period prescribed by the CLRA for such demands.  However, Defendant has failed to do so.

75.   Therefore, Plaintiff requests statutory and actual damages, as well as punitive damages, interest and attorneys' fees as authorized by Section 1780(a) of the CLRA.

76.   Regardless of an award of damages, however, Plaintiff seeks and is entitled to, pursuant to Section 1780(a)(2) of the CLRA, an order for the equitable relief described above, as well as costs, attorney's fees and any other relief which the Court deems proper.

## VIII. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, JULIE MARTIN, individually, and on behalf of all others similarly situated, prays for relief pursuant to each cause of action set forth in this Complaint as follows:

1.      For an order certifying that the action may be maintained as a class action, certifying Plaintiff as representative of the Class, and designating her attorneys Class counsel;

2.      For an award of equitable relief as follows:

(a)     Enjoining Defendant from making any claims for the Products found to violate the UCL, FAL, or CLRA as set forth above;

(b)     Requiring Defendant to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint; and

(c)     Requiring Defendant to disgorge all ill-gotten gains flowing from the conduct described in this Complaint.

3.      For an award of attorney's fees pursuant to, *inter alia*, §1780(d) of the CLRA and Code of Civil Procedure §1021.5.

4.      For actual damages in an amount to be determined at trial.

5.      For punitive damages in an amount to be determined at trial.

6.      For actual and punitive damages as may be provided for by statute under the Third Cause of Action for violations of the CLRA, because the demanded corrections failed to take place within the thirty (30) day notice period.

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

**Respectfully Submitted,**

**Dated: <u>September 13, 2012</u>**          By: <u>/s/   Benjamin M. Lopatin</u>
                                             Benjamin M. Lopatin, Esq.
                                             Cal. Bar No.: 281730
                                             *lopatin@hwrlawoffice.com*
                                             **THE LAW OFFICES OF**
                                             **HOWARD W. RUBINSTEIN, P.A.**
                                             One Embarcadero Center, Suite 500
                                             San Francisco, CA 94111
                                             (800) 436-6437
                                             (415) 692-6607 (fax)

                                             L. De-Wayne Layfield, Esq.
                                             Texas Bar No.:  12065710
                                             *dewayne@layfieldlaw.com*
                                             **LAW OFFICE OF L.**
                                             **DEWAYNE LAYFIELD**
                                             PO Box 3829
                                             Beaumont, TX 77704-3829
                                             (409) 832-1891
                                             (866) 280-3004 (fax)
                                             (To apply as counsel *Pro Hac Vice*)

                                             *Attorneys for Plaintiff Julie Martin*

# EXHIBIT

# 1

# Stay satisfied throughout the day with **Kashi**® **GOLEAN**® Cereals & Bars



Just like **Kashi**® **GOLEAN**® cereals, our tasty **GOLEAN**® bars are designed with a unique blend of protein and fiber to help you stay satisfied and committed to eating right.

GOLEAN® Crunchy!
Chocolate Caramel

**PROTEIN**

**Stay Fuller Longer!***

**FIBER**

**ALL NATURAL**



GOLEAN® Roll!
Caramel Peanut



GOLEAN® Protein & Fiber
Chocolate Peanut Butter

Expires 9/30/2012

## 50¢ off
any single **Kashi**® **GOLEAN**® Crunchy!, Roll! or Protein & Fiber Bar



Expires 9/30/2012

## $1 off
any **Kashi**® **GOLEAN**® Crunchy!, Roll! or Protein & Fiber 4-Pack



✂ clip here & save!

Look for **Kashi**® **GOLEAN**® bars in the pharmacy and energy bar aisles.

*GOLEAN products are designed to promote a feeling of fullness by increasing daily intake of protein and fiber.

For more about the GOLEAN family, visit us at www.kashi.com/GOLEAN

# EXHIBIT

## 2



**Kashi**
The Seven Whole Grain Company

# GO LEAN
Crunch!®

## Nutrition Facts

Serving Size 1 Cup (53g/1.9 oz.)
Servings Per Container About 8

**Amount Per Serving**

| | |
|---|---|
| **Calories** 190 | Calories from Fat 25 |

| | **% Daily Value*** |
|---|---|
| **Total Fat** 3g | **5%** |
| Saturated Fat 0g | **0%** |
| *Trans* Fat 0g | |
| Polyunsaturated Fat 1g | |
| Monounsaturated Fat 2g | |
| **Cholesterol** 0mg | **0%** |
| **Sodium** 100mg | **4%** |
| **Potassium** 300mg | **9%** |
| **Total Carbohydrate** 37g | **12%** |
| Dietary Fiber 8g | **32%** |
| Soluble Fiber 3g | |
| Insoluble Fiber 5g | |
| Sugars 13g | |
| **Protein** 9g | **14%** |

| | | | |
|---|---|---|---|
| Vitamin A 0% | • | Vitamin C 0% | |
| Calcium 4% | • | Iron 10% | |
| Phosphorus 10% | • | Magnesium 10% | |

* Percent Daily Values are based on a 2,000 calorie diet.
Your daily values may be higher or lower depending on
your calorie needs.

| | | Calories: | 2,000 | 2,500 |
|---|---|---|---|---|
| Total Fat | Less than | | 65g | 80g |
| Sat. Fat | Less than | | 20g | 25g |
| Cholesterol | Less than | | 300mg | 300mg |
| Sodium | Less than | | 2,400mg | 2,400mg |
| Potassium | | | 3,500mg | 3,500mg |
| Total Carbohydrate | | | 300g | 375g |
| Dietary Fiber | | | 25g | 30g |
| Protein | | | 50g | 65g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**INGREDIENTS: KASHI SEVEN WHOLE GRAINS &
SESAME BLEND (WHOLE: HARD RED WHEAT, BROWN
RICE, BARLEY, TRITICALE, OATS, RYE, BUCKWHEAT,
SESAME SEEDS), SOY PROTEIN CONCENTRATE,
EVAPORATED CANE JUICE CRYSTALS, BROWN RICE
SYRUP, CHICORY ROOT FIBER, WHOLE GRAIN OATS,
EXPELLER PRESSED CANOLA OIL, HONEY, SALT,
CINNAMON, MIXED TOCOPHEROLS FOR FRESHNESS.
CONTAINS WHEAT AND SOY INGREDIENTS.**

DISTRIBUTED BY
Kashi Sales L.L.C.
La Jolla, CA 92038 U.S.A.
®, ™, ©2012 Kashi Company

Have something to share?
We'd love to hear from you!
Visit us at www.kashi.com

Call 877-7GRAINS
(877-747-2467)

25 grams of soy protein a day, as part of a diet low in
saturated fat and cholesterol, may reduce the risk of
heart disease. A serving of Kashi® GOLEAN Crunch!®
cereal provides 6.25 grams of soy protein.

**Exchange:** 2 Carbohydrates & 1 Very Lean Protein
The dietary exchanges are based on *Choose Your Foods:
Exchange Lists for Diabetes.* ©2008 by American Dietetic
Association and American Diabetes Association.

**WHOLE
GRAIN**
17g or more
per serving
WholeGrainsCouncil.org

EAT 48g OR MORE OF
WHOLE GRAINS DAILY
The Whole Grain Stamp is a
trademark of Oldways/WGC.

# EXHIBIT

# 3



Call Toll Free: **877-985-2695**

# The One and Only Way You Can Tell if a Food is GMO-Free

Posted By <u>Dr. Mercola</u> | **February 29 2012** | **97,929 views**

**By Dr. Mercola**

A bill has recently been introduced in the Vermont state legislature that would require food to be labeled as genetically engineered if it is entirely or partially produced with genetically engineered ingredients.

If passed, the bill, H.722, also known as the 'VT Right to Know Genetically Engineered Food Act' [i], will take effect in 2014.

The bill also forbids any such food from using advertising or promotional material that states or implies that the food is:

- "natural"
- "naturally made"
- "naturally grown"
- "all natural," or
- Any words of similar meaning

According to the language of the bill, it would require:

> "... in the case of a rawagricultural commodity, on the package offered for retail sale ... the clear and conspicuous
> 'genetically engineered' on the front of the package ... [or] on a label appearing on the retail store shelf or bin in wh
> commodity is displayed for sale.

> ... in the case of any processed food, in clear and conspicuous language on the front or back of the package ... the
> 'partially produced with genetic engineering' or 'may be partially produced with genetic engineering'". [ii]

## More U.S. States Starting to Demand Labeling of GM Foods

Finally we're starting to see some real opposition against genetically engineered foods in general, and *un*labeled GMO's (modified organisms) in particular, in the U.S.! Aside from this Vermont bill, California, Michigan and Washington are also ballot initiatives to get mandatory labeling of genetically modified (GM) foods in their states. Vermont takes it a step furthe the legislation would effectively also end phony "all natural" claims for products that in actuality contain wholly *un*natural, GN

Personally, I believe GM foods must be banned entirely, but labeling is the most efficient way to achieve this. Since 85 per public will refuse to buy foods they know to be genetically modified, this will effectively eliminate them from the market just done in Europe.

Sheer ignorance on the part of American consumers has allowed Monsanto and other biotech companies to saturate the r their genetically altered wares. And misuse of the "all natural" label has only made matters worse. According to a 2010 Ha poll, more than 60 percent of consumers erroneously believe that the "natural" label implies or suggests the absence of GN but that is sadly NOT the case... In fact, at the current time, the ONLY label that can protect you against GM ingredients is th 100% Organic label.

After reading the Cornucopia Institutes' 2011 report *Cereal Crimes*[iii], many, including myself, were shocked to discover so favorite natural and even some organic brands were using GM ingredients! For example, natural products that contained i

**Story at-a-glance**

» Vermont has recently introduced l
   requiring labeling of foods contain
   engineered ingredients. Such pro
   also be prohibited from using adv
   promotional material that states o
   the food is "natural". If passed, th
   effect in 2014

» Other US states pushing for man
   of genetically modified (GM) foods
   California, Michigan and Washing

» Mandatory labeling of GM foods is
   more important to counteract law
   anti-GMO efforts. So far, 14 US st
   passed laws to protect the unaba
   GM seed use. Pending legislation
   now also seeks to prohibit local g
   from passing ordinances that imp
   the use of GM seeds of all kinds

*genetically modified grains* included:

| Kashi® | Mother's® | Nutritious Living® | General Mills Kix® |
|--------|-----------|--------------------|--------------------|
| GoLean® | Bumpers® | Hi-Lo® | |

Two breakfast cereal products that are currently enrolled in the Non-GMO Project, Barbara's Bakery's Puffins and Whole F Corn Flakes, contained more than **50 percent GM corn**. Meanwhile, the control, Nature's Path® USDA certified organic c contained only trace amounts of GM contamination (less than 0.5 percent). Another sign that American consumers are get with being stonewalled on the GMO labeling issue is the fact that lawsuits are starting to crop up, accusing food manufactu deceptive and misleading practices over their "all natural" claims. Here are just a couple of recent examples:

- Frito-Lay is being sued by a New York consumer over their 'all natural' snacks that are actually made using GM ingre as Tostitos and SunChips[iv]

- On August 31, 2011, a class action lawsuit was filed against Kellogg/Kashi® for allegedly misleading consumers wit claims. One Kashi® product in particular, GoLean® Shakes, is composed almost entirely of synthetic and unnaturally ingredients, according to the plaintiff

## Why We MUST Insist on Mandatory Labeling of GM Foods

As I said earlier, mandatory labeling may be the only way to stop the proliferation of GM foods in the U.S. because while G banned in several European countries such as Hungary, Germany and Ireland, in the United States, certain states are pass legislation that *protects* the use of GM seeds and allows for unabated *expansion!* At present, no less than 14 states have legislation. Michigan's Senate Bill 777[v], if passed, would make that 15. The Michigan bill would prevent anti-GMO laws, ar remove "*any authority local governments may have to adopt and enforce ordinances that prohibit or regulate the labeli storage, transportation, distribution, use, or planting of agricultural, vegetable, flower or forest tree seeds.*"

While this type of legislation sounds like crazy nonsense to normal people, such bills are essentially bought and paid for th millions of dollars Monsanto and other biotech companies spend lobbying the U.S. government each year. In the first quart alone, Monsanto spent $1.4 million on lobbying the federal government -- a drop from a year earlier, when they spent $2.5 the same quarter.

Their efforts of persuasion are also made infinitely easier by the fact that an ever growing list of former Monsanto employe positions of power within the federal government.

## Learn More about Genetically Modified (GM) Foods

Due to lack of labeling, many Americans are still unfamiliar with what GM foods are. We have a plan to change that, and I u participate and to continue learning more about GM foods and helping your friends and family do the same.

To start, please print out and use the Non-GMO Shopping Guide, created by the Institute for Responsible Technology. Sha friends and family, and post it to your social networks. You can also download a free iPhone application, available in the iT You can find it by searching for ShopNoGMO in the applications.

Your BEST strategy, however, is to simply buy USDA 100% Organic products whenever possible, is (as these do not permit ingredients) or buy whole fresh produce and meat from local farmers. The majority of the GMO's you're exposed to are via foods, so by cooking from scratch with whole foods, you can be sure you're not inadvertently consuming something laced v ingredients. When you do purchase processed food, avoid products containing anything related to corn or soy that are not organic, as any foods containing these two non-organic ingredients are virtually *guaranteed* to contain genetically enginee ingredients, as well as toxic herbicide residues.

To learn more about GM foods, I highly recommend the following films and lectures:

- Hidden Dangers in Kid's Meals

- Your Milk on Drugs - Just Say No!

- Everything You Have to Know About Dangerous Genetically Modified Foods

## Your Opportunity to Eliminate Genetically Engineered Foods from the U.S.

In 2007, then-Presidential candidate Obama promised to "immediately" require GM labeling if elected. So far, nothing of t transpired.

Labeling of genetically engineered food is way overdue... Here's how you can get involved to rectify the situation:

- Whether you live in California or not, please donate money to this historic effort

- Talk to organic producers and stores and ask them to actively support the California Ballot. It may be the only chance label genetically engineered foods.

- Distribute WIDELY the Non-GMO Shopping Guide to help you identify and avoid foods with GMOs. Look for product organic products) that feature the **Non-GMO Project Verified Seal** to be sure that at-risk ingredients have been tes content. You can also download the free iPhone application that is available in the iTunes store. You can find it by sea ShopNoGMO in the applications.

- For timely updates, please join the Organic Consumers Association on Facebook, or follow them on Twitter.

- Look for in-depth coverage of the issue at the Institute for Responsible Technology, subscribe to *Spilling the Beans*, out their Facebook or Twitter.

In the meantime, the simplest way to avoid genetically engineered foods is to buy whole, certified organic foods. By definit that are certified organic must never intentionally use genetically engineered organisms, must be produced without artificia and fertilizers and come from an animal reared without the routine use of antibiotics, growth promoters or other drugs. Add grass-fed beef will not have been fed genetically engineered corn feed, although now that genetically engineered alfalfa is grass-fed will not always mean they animals have not consumed genetically engineered feeds.[vi]

Be assured that what happens in California will affect the remainder of the U.S., so please support this important state initi you do not live there!

### References:

[i] The Vermont Legislative Bill Tracking System

[ii] The Vermont Legislative Bill Tracking System

[iii] Cereal Crimes, the Cornucopia Institute

[iv] Natural Society January 31, 2012

<sup>v</sup> The Michigan Citizen,

<sup>vi</sup> GMO Labeling

Source:  The Vermont Legislative Bill Tracking System 2012

## Related Links:

» **Latest GMO News**

# EXHIBIT

# 4



2 of 4 DOCUMENTS


Copyright 2011 Los Angeles Times
All Rights Reserved
Los Angeles Times

June 2, 2011 Thursday
Home Edition

**SECTION:** BUSINESS; Business Desk; Part B; Pg. 4

**LENGTH:** 1195 words

**HEADLINE:** Debate rages over labeling biotech foods;
Industry resists listing genetically modified ingredients; consumer worries continue.

**BYLINE:** Monica Eng

**DATELINE:**  CHICAGO

**BODY:**

When a team of activists wearing white hazmat suits showed up at a Chicago grocery store to protest the sale of food containing genetically modified ingredients, they picked an unlikely target: Whole Foods Market.

Organic foods, by definition, can't contain genetically modified organisms, known as GMOs. But genetically modified corn, soy and other crops have become such common ingredients in processed foods that even one of the nation's top organic food retailers says it's been unable to avoid stocking some products that contain them.

"No one would guess that there are genetically engineered foods right here in Whole Foods," said Alexis Baden-Mayer, political director of the Organic Consumers Assn., which organized the protest. The activists dramatically trashed a battery of well-known health food brands outside the store, including Tofutti, Kashi and Boca Burgers.

Though people have been modifying foodstuffs through selective breeding and other methods for centuries, genetically modified crops differ in that the plants grow from seeds in which DNA splicing has been used to place genes from one species into another. In this way, the crop can be made to withstand a weed-killing pesticide, for example, or incorporate a bacterial toxin that can repel pests.

Some consumers are concerned that such changes may pose health risks and say manufacturers should be required to prove GMOs are safe for human consumption before putting them on the market. They also say products containing genetically modified ingredients should be identified for the consumer; the U.S. is one of the few industrialized nations that does not require such labeling.

Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue. Los Angeles Times June 2, 2011 Thursday

Industry representatives say GMOs are safe and labeling them is unnecessary, citing a 1992 statement from the Food and Drug Administration saying the agency had no reason to believe GMOs "differ from other foods in any meaningful or uniform way." No mainstream regulatory organization in the U.S. has opposed the introduction of GMOs.

"FDA has the scientific and nutrition expertise to establish food labeling and to assess food safety," said Ab Basu, the Biotechnology Industry Organization's acting executive vice president for food and agriculture. "You can look at the FDA website and see that if the corn is substantially equivalent to corn produced conventionally, there is no reason to label it as being any different."

Critics of the technology say they are concerned not only about possible health risks but also about soil and plant nutrient losses, contamination of non-GMO crops and increased pesticide use.

With an unprecedented number of genetically modified crops being greenlighted by the Obama administration in recent months amid public debate -- including ethanol corn, alfalfa and sugar beets under certain conditions -- some advocates say the issues may be reaching the awareness of consumers beyond the health-conscious shoppers who frequent Whole Foods.

They cite polls taken by the Pew Center, Consumers Union, Harris Interactive and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.

"If companies say genetic engineering is fine, then OK, let's label it and let the consumers make their own decisions," said Michael Hansen, a senior scientist at Consumers Union, which publishes Consumer Reports. "That's what all the free-market supporters say. So let's let the market work properly."

Michael Jacobsen, executive director of the Center for Science in the Public Interest, which does not oppose GMOs, says many manufacturers see labeling as too risky. "No food company would use GMOs if they had to label them because there is no benefit to the companies," he said. "The term GMO has become a toxic term, and so if a company figures they will lose maybe 2% of their sales, why should they? It's all loss for them."

In fact, a 2006 study for the Pew Initiative for Food and Biotechnology found that only 23% of women (the primary shopping decision makers) thought genetically modified foods were safe.

But knowledge on this topic also remains low. The same Pew study found that only 26% of U.S. consumers believed they'd ever eaten genetically modified food, while a 2010 survey by the International Food Information Council reported that only 28% of respondents knew such foods were sold in stores.

Currently 14 states have introduced legislation on GMO labeling, but only Alaska, with its huge wild salmon industry, has passed a biotech seafood labeling law.

On the issue of safety, both sides of the debate come armed with research. This year Spanish researchers published an overview of GMO food safety studies in Environment International finding that peer-reviewed studies had found health risks and no health risks in roughly equal numbers. The paper notes, however, that many studies finding no risks were sponsored by the biotech industry or associates.

Canadian researchers this year reported that the blood of 93% of pregnant women and 80% of their umbilical-cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though digestion was supposed to remove it from the body. "Given the potential toxicity of these environmental pollutants and the fragility of the fetus, more studies are needed," they wrote in Reproductive Toxicology.

As the biggest producer of GMO seeds and the compatible pesticide Roundup, Missouri-based Monsanto is at the

Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue. Los Angeles Times June 2, 2011 Thursday

heart of the GMO debate. Monsanto would not make a representative available for an interview but did offer a statement on the lack of long-term animal or human safety studies on genetically modified crops.

"Experts in the field of food safety are satisfied that [the current] approach is sufficient and reliable to assure the genetically modified crops are as safe their conventional counterparts," the statement said.

"This expert community does not see a need and thus does not recommend long-term tests in humans or animals in order to establish food safety."

While the Food and Drug Administration has allowed the sale and planting of genetically modified foods for 15 years, it has never required pre-market safety evaluations of the foods. The one exception was the 1994 GM Flavr Savr tomato, which was categorized as a food additive and thus more closely regulated.

"Ultimately, it is the food producer who is responsible for assuring safety," the FDA wrote in a statement to the Chicago Tribune, noting that manufacturers are encouraged to consult with the agency about their products.

Used in an estimated 70% of all American processed food, GM crops make up an estimated 93% of all soy, 86% of all corn and 93% of all canola seeds planted in the U.S., which makes stocking only non-GMO products difficult, said Joe Dickson, quality standards coordinator for Whole Foods Market.

"Until there's federal government mandated labeling of GMO ingredients, there's no way to tell if packaged products contain GMO ingredients," Dickson said.

"Our approach is to work in the spirit of partnership with our suppliers ... to encourage them to take active steps to avoid GMO ingredients."

--

meng@tribune.com

**LOAD-DATE:** June 2, 2011

# EXHIBIT

# 5



3 of 4 DOCUMENTS

Copyright 2011 Chicago Tribune Company
All Rights Reserved
Chicago Tribune

May 25, 2011 Wednesday
Chicagoland Final Edition

**SECTION:** NEWS ; ZONE C; Pg. 4

**LENGTH:** 1788 words

**HEADLINE:** Altered food labeling sought \ Prevalence of genetically modified fare sparks protests

**BYLINE:** By Monica Eng, Tribune reporter

**BODY:**

When a team of activists wearing white hazmat suits showed up at a Chicago grocery store to protest the sale of genetically modified foods, they picked an unlikely target: Whole Foods Market.

Organic foods, by definition, can't knowingly contain genetically modified organisms, known as GMOs. But genetically modified corn, soy and other crops have become such common ingredients in processed foods that even one of the nation's top organic food retailers says it hasn't been able to avoid stocking some products that contain them. "No one would guess that there are genetically engineered foods right here in Whole Foods," said Alexis Baden-Mayer, political director of the Organic Consumers Association, which organized the protest. The activists dramatically trashed a battery of well-known health food brands outside the store, including Tofutti, Kashi and Boca Burgers.

Though people have been modifying foodstuffs through selective breeding and other methods for centuries, genetically modified crops differ in that the plants grow from seeds in which DNA splicing has been used to place genes from another source into a plant. In this way, the crop can be made to withstand a weed-killing pesticide, for example, or incorporate a bacterial toxin that can repel pests.

Some consumers are concerned that such changes may pose health risks and say manufacturers should be required to prove GMOs are safe for human consumption before putting them on the market. They also say products containing genetically modified ingredients should be identified for the consumer; the U.S. is one of the few industrialized nations that does not require such labeling or testing.

Industry representatives say that GMOs are safe and that labeling them is unnecessary, citing a 1992 statement from the FDA saying the agency had no reason to believe GMOs "differ from other foods in any meaningful or uniform way." No mainstream regulatory organization in the U.S. has opposed the introduction of GMOs.

Altered food labeling sought \ Prevalence of genetically modified fare sparks protests Chicago Tribune May 25, 2011 Wednesday

"FDA has the scientific and nutrition expertise to establish food labeling and to assess food safety," said Ab Basu, the Biotechnology Industry Organization's acting executive vice president for food and agriculture. "You can look at the FDA website and see that if the corn is substantially equivalent to corn produced conventionally, there is no reason to label it as being any different."

Critics of the technology say they are concerned not only about possible health risks but also about soil and plant nutrient losses, contamination of non-GMO crops and increased pesticide use.

With an unprecedented number of genetically modified crops being greenlighted by the Obama administration in recent months amid public debate -- including ethanol corn, alfalfa and sugar beets under certain conditions -- some advocates say the issues may be reaching the awareness of consumers beyond the health-conscious shoppers who frequent Whole Foods.

They cite polls taken by the Pew Center, Consumers Union and Harris Interactive over the last decade that have consistently found the vast majority of Americans would like to see genetically modified foods better regulated and labeled.

"If companies say genetic engineering is fine, then OK let's label it and let the consumers make their own decisions," said Michael Hansen, a senior scientist at Consumers Union, which produces Consumer Reports. "That's what all the free market supporters say. So let's let the market work properly."

Michael Jacobsen, executive director for Center for Science in the Public Interest, which does not oppose GMOs, says many manufacturers see labeling as too risky. "No food company would use GMOs if they had to label them because there is no benefit to the companies," he said. "The term GMO has become a toxic term, and so if a company figures they will lose maybe 2 percent of their sales why should they? It's all loss for them."

In fact, a 2006 study for the Pew Initiative for Food and Biotechnology found that only 23 percent of women (the primary shopping decision makers) thought genetically modified foods were safe.

But knowledge on this topic also remains low. The same Pew study found that only 26 percent of American consumers believed they'd ever eaten genetically modified food, while a 2010 survey by the International Food Information Council reported that only 28 percent of respondents knew such foods were sold in stores.

Currently 14 states have introduced legislation on GMO labeling but most of it has not moved out of committee, including an Illinois bill introduced in February by Rep. Deborah Mell, D-Chicago. She says she plans to reintroduce it next session. Only Alaska, with its huge wild salmon industry, has passed a biotech seafood labeling law.

On the issue of safety, both sides of the debate come armed with research. This year Spanish researchers published an overview of GMO food safety studies in Environment International, finding that peer-reviewed studies had found health risks and no health risks in roughly equal numbers. The paper notes, however, that many studies finding no risks were sponsored by the biotech industry or associates.

Canadian researchers this year reported that the blood of 93 percent of pregnant women and 80 percent of their umbilical cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though digestion is supposed to remove it from the body. "Given the potential toxicity of these environmental pollutants and the fragility of the fetus, more studies are needed," they wrote in Reproductive Toxicology.

As the biggest producer of GMO seeds and the compatible pesticide Roundup, Missouri-based Monsanto is at the heart of the GMO debate. Monsanto made a representative available for an interview but did offer a statement on the lack of long-term animal or human safety studies on genetically modified crops.

"Experts in the field of food safety are satisfied that (the current) approach is sufficient and reliable to assure the

Altered food labeling sought \ Prevalence of genetically modified fare sparks protests Chicago Tribune May 25, 2011 Wednesday

genetically modified crops are as safe as their conventional counterparts," the statement said. "This expert community does not see a need and thus does not recommend long-term tests in humans or animals in order to establish food safety."

While the Food and Drug Administration has allowed the sale and planting of genetically modified foods for 15 years, it has never required premarket safety evaluations of the foods.

"Ultimately, it is the food producer who is responsible for assuring safety," the FDA wrote in a statement to the Tribune, noting that manufacturers are encouraged to consult with the agency about their products.

Used in an estimated 70 percent of all American processed food, genetically modified crops make up 93 percent of all soy, 86 percent of all corn and 93 percent of all canola seeds planted in the U.S., which makes stocking only non-GMO products difficult, said Joe Dickson, quality standards coordinator for Whole Foods Market.

"Until there's federal government mandated labeling of GMO ingredients, there's no way to tell if packaged products contain GMO ingredients," Dickson said. "Our approach is to work in the spirit of partnership with our suppliers ... to encourage them to take active steps to avoid GMO ingredients."

Basu notes that GMO crops have been embraced by farmers in many countries -- although not in Japan, Europe or Britain -- and cites an International Food Information Council study that found 68 percent of those surveyed believe that FDA's current labeling practices are sufficient.

"If you look at the adoption of biotech by over 24 countries and over 2 billion acres of biotech crops globally that have been grown in the last 15 years of commercialization, consumer are buying these products," he said.

Still, Nielsen announced last year that "non-GMO" was the fastest-growing health and wellness claim on store-brand foods in 2009, up by 67 percent from the previous year and representing $60.2 million in sales.

And 2010 brought a new "Non-GMO Project Verified" seal, offering third-party certification that less than 0.9 percent of the ingredients in the product came from genetically modified organisms. More than 4,000 products -- including all Whole Foods store brands -- have been enrolled in the program, according to executive director Megan Westgate.

Shoppers at Whole Foods last week were conflicted about whether the store should be selling genetically modified foods. But the majority said they were surprised to find it did.

"It's disappointing and disheartening. I feel like Whole Foods has established itself as a community for people who believe in healthy food and I feel like they embody that. So I would think that they would uphold standards and prevent foods like this from being sold here," said Melissa Hayes, of Chicago.

"But I don't think it's fair to just blame Whole Foods," she added. "I think it's equally important for the consumer to take an active role and find out information on GMOs and Monsanto. Every time you make a purchase it's a vote and people just need to be more conscious and aware."

- - -

If you want to avoid GMOs

Several shopping guides have been published in recent years offering vetted lists of products that do or don't contain biotech ingredients. They include the Non-GMO Shopping Guide, the Greenpeace Shoppers Guide and an iPhone app from the Non-GMO Project.

They also offer general guidance on avoiding GMO foods, including:

Altered food labeling sought \ Prevalence of genetically modified fare sparks protests Chicago Tribune May 25, 2011 Wednesday

*Look for the Non-GMO Project Verified seal, which is the only third-party-tested verification program in the U.S.

*Choose certified organic foods, which cannot contain genetically modified ingredients or feed (for animals) as part of their certification.

*The most common genetically modified crops are field corn (used for grain, processed food ingredients and animal feed), soy, canola, wheat, cotton, alfalfa, rice, sugar beets and flax.

*These crops often are added to processed foods as oils, sweeteners and soy proteins but also can be part of amino acids, aspartame, ascorbic acid, sodium ascorbate, vitamin C, citric acid, sodium citrate, ethanol, flavorings (natural and artificial), hydrolyzed vegetable protein, lactic acid, maltodextrins, microbial growth media, molasses, monosodium glutamate, sucrose, textured vegetable protein, xantham gum, vitamins and yeast products, according to the Non-GMO Project.

*Unless sugar is labeled as pure cane or organic, it likely contains sugar from genetically modified sugar beets.

*Most fresh produce is GMO-free except Hawaiian papaya, crookneck squash, zucchini and a small percentage of sweet corn.

*Whole Foods and Trader Joe's say all their store brand items are sourced from non-GMO foods.

meng@tribune.com 2011 0058 110525 N S 0000000000 00003700

**NOTES:** NEWS FOCUS: Consumer watch

**GRAPHIC:** Photo (color): Activists with the Organic Consumers Association demonstrate outside Whole Foods in Lincoln Park. Even the organic food retailer says it can't avoid some products with GMOs. ALEX GARCIA/TRIBUNE PHOTO\ Graphic: Genetically modified foods grow concerns\ The percentage of U.S. crops that are genetically modified has risen\ sharply over the past decade, raising safety concerns from food industry\ critics who cite unknown health effects among other factors. Several\ states are considering laws that would require foods that contain\ genetically modified organisms (GMOs) to carry special labeling.\ Percentage of U.S. crops planted that are genetically modified\ Soybeans, 2010: 93%\ Corn, 2010: 86%
States with proposals requiring labeling of GMO foods
More than 40 countries require GMO labeling; the U.S. does not.\ Selected countries with GMO labeling\ Australia\ Brazil\ Britain\ China\ France\ Germany\ Italy\ Japan\ Mexico\ Russia\ South Korea\ Spain\ Poland\ Saudi Arabia
SOURCES: USDA, Organic Consumers Association, Center for Food Safety, Consumers Union\ TRIBUNE\ - See microfilm for complete graphic
Photo(s) Graphic(s)

**LOAD-DATE:** May 25, 2011

# EXHIBIT

# 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT BRISENO, individually and on behalf of all others similarly situated, | ) CASE NO. CV 11-05379  MMM (AGRx)<br>) |
| Plaintiff, | ) TENTATIVE ORDER GRANTING<br>) DEFENDANT'S MOTION TO DISMISS |
| vs. | )<br>) |
| CONAGRA FOODS, INC., | )<br>) |
| Defendant. | ) |

Robert Briseno filed this putative class action against ConAgra Foods, Inc. on June 28, 2011.[1]  On August 24, 2011, ConAgra moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2]  Briseno opposes the motion.[3]

## I. BACKGROUND

[1]Class Action Complaint ("Complaint"), Docket No. 1 (June 28, 2011).

[2]Motion to Dismiss Class Action Complaint ("Motion"), Docket No. 24 (August 24, 2011); see also Defendant ConAgra Foods, Inc. Reply Memorandum in Support of Motion to Dismiss Class Action Complaint ("Reply"), Docket No. 39 (October 24, 2011).

[3]Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opposition"), Docket No. 34 (October 10, 2011).

Briseno alleges that he regularly purchased Wesson Canola Oil, a product marketed and distributed by ConAgra.[4] ConAgra purportedly sells four types of cooking oils under the Wesson brand, all bearing labels that state the product is "100% Natural."[5] ConAgra allegedly asserts that its products are "100% Natural" in its print and online advertising as well.[6] Briseno contends that contrary to these representations, ConAgra uses plants grown from genetically modified organism seeds that have been engineered to allow for greater yield and to be pesticide-resistant to make Wesson-branded oils.[7] He asserts that the genetically modified organisms are not "100% natural," and that ConAgra's labels and advertising are deceptive and likely to mislead the public as a result.[8]

Briseno seeks to represent a class of "[a]ll persons in the United States who have purchased Wesson Oils from June 27, 2007 through the final disposition of this and any and all related actions."[9] He pleads four causes of action: (1) violation of California's false advertising law ("FAL"), California Business & Professions Code §§ 17500 et seq.; (2) violation of California's unfair competition law ("UCL"), California Business & Professions Code §§ 17200 et seq.; (3) violation of California's Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 et seq.; and (4) breach of express warranty.[10] Briseno seeks (1) a declaration that ConAgra has violated these statutes and breached express warranties; (2) damages; (3) restitution of monies wrongfully obtained by ConAgra and/or disgorgement of revenues and/or profits; (4) a permanent injunction enjoining ConAgra from continuing to harm Briseno and other members of

---

[4]Complaint, ¶ 11.

[5]*Id.*, ¶ 13.

[6]*Id.*, ¶ 14.

[7]*Id.*, ¶ 17.

[8]*Id.*, ¶ 23.

[9]*Id.*, ¶ 24.

[10]*Id.*, ¶¶ 33-70.

2

the putative class and from violating California law; (5) an order requiring ConAgra to adopt and enforce a policy that requires appropriate disclosure of genetically modified ingredients and/or removal of misleading natural claims, and that complies with California law; and (6) attorneys' fees and costs of suit.[11]

## II.  DISCUSSION

### A.  Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1988). In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Insurance Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995). It need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations. See *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) ("[B]are assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" are not entitled to an assumption of truth, quoting *Bell Atlantic Corp. v. Twombly*, 50 U.S. 544, 555 (2007)); see also *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("Such allegations are not to be discounted because they are 'unrealistic or nonsensical,' but rather because they do nothing more than state a legal conclusion – even if that conclusion is cast in the form of a factual allegation").

To survive a motion to dismiss, plaintiff's complaint must "contain sufficient factual

---

[11]*Id.* at 15.

3

1    matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has

2    facial plausibility when the plaintiff pleads factual content that allows the court to draw the

3    reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct.

4    at 1949. See also *id*. ("The plausibility standard is not akin to a 'probability requirement,' but

5    it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a

6    complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of

7    the line between possibility and plausibility of "entitlement to relief,"'" quoting *Twombly*, 550

8    U.S. at 557); *Twombly*, 550 U.S. at 545 ("While a complaint attacked by a Rule 12(b)(6) motion

9    to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the

10   'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

11   formulaic recitation of the elements of a cause of action will not do. Factual allegations must be

12   enough to raise a right to relief above the speculative level, on the assumption that all the

13   allegations in the complaint are true (even if doubtful in fact)" (citations omitted)). See also, e.g.,

14   *Moss*, 572 F.3d at 969 ("[F]or a complaint to survive a motion to dismiss, the non-conclusory

15   'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a

16   claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

### B.    Federal Preemption under the NLEA

18       The Supremacy Clause of the United States Constitution empowers Congress to enact

19   legislation that preempts state law. See *Gibbons v. Ogden*, 22 U.S. 1, 82 (1824) ("In every such

20   case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in

21   the exercise of powers not controverted, must yield to it"); *Law v. General Motors Corp.*, 114

22   F.3d 908, 909 (9th Cir. 1997) ("The Supremacy Clause empowers Congress to supplant

23   decentralized, state-by-state regulation with uniform national rules").

24       "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts

25   state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative

26   field to such an extent that it is reasonable to conclude that Congress left no room for state

27   regulation in that field." *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (quoting *Tocher*

28   *v. City of Santa Ana*, 219 F.3d 1040, 1045 (9th Cir. 2000), abrogated on other grounds by *City*

1   *of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424 (2002)).

2       ConAgra contends that Briseno's claims are preempted by the Federal Food, Drug, and

3   Cosmetic Act ("FDCA"). In assessing this argument, the court must be mindful of the

4   presumption against preemption. See *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("In

5   all preemption cases, and particularly in those in which Congress has 'legislated . . . in a field

6   which the States have traditionally occupied,' we 'start with the assumption that the historic police

7   powers of the States were not to be superseded by the Federal Act unless that was the clear and

8   manifest purpose of Congress'"); see also *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449

9   (2005) ("[B]ecause the States are independent sovereigns in our federal system, we have long

10  presumed that Congress does not cavalierly preempt state-law causes of action"); *Law*, 114 F.3d

11  at 909-10 ("Given the  importance of federalism in our constitutional structure, however, we

12  entertain a strong presumption that federal statutes do not preempt state laws; particularly those

13  laws directed at subjects – like health and safety – 'traditionally governed' by the states. 'Thus,

14  pre-emption will not lie unless it is the clear and manifest purpose of Congress'" (citations

15  omitted)); see also *In re Farm Raised Salmon Cases*, 42 Cal.4th 1077, 1088 (2008) (noting that

16  consumer protection laws such as the UCL, false advertising law and CLRA are within the states'

17  historic police powers and therefore subject to the presumption against preemption). Where

18  Congress has expressly preempted state law, the presumption against preemption requires the

19  court to read the federal statute narrowly. See *Lohr*, 518 U.S. at 485 (citing *Cipollone v. Liggett

20  Group, Inc.*, 505 U.S. 504, 518 (1992)). This is particularly true in cases involving food

21  labeling, "an area historically governed by state law." *Astiana v. Ben & Jerry's Homemade, Inc.*,

22  Nos. C 10–4387 PJH, C 10–4937 PJH, 2011 WL 2111796, *8 (N.D. Cal. May 26, 2011).

23      The FDCA was enacted in 1938 as a successor to the 1906 Pure Food and Drugs Act,

24  which was the first piece of comprehensive federal legislation designed to protect consumers from

25  fraud and misrepresentation in the sale of food and drugs. See James T. O'Reilly, FOOD AND

26  DRUG ADMINISTRATION § 3:1-13 (3d ed. 2009). The FDCA empowers the Food and Drug

27  Administration ("FDA") (a) to protect the public health by ensuring that "foods are safe,

28  wholesome, sanitary, and properly labeled," 21 U.S.C. § 393(b)(2)(A); (b) to promulgate

1    regulations to implement the statute; and (c) to enforce its regulations through administrative

2    proceedings. see 21 C.F.R. § 7.1 et seq.  The FDCA deems a food "misbranded" if its labeling

3    "is false or misleading in any particular." 21 U.S.C. § 343(a).

4         In 1990, Congress amended the FDCA by enacting the Nutrition Labeling and Education

5    Act ("NLEA") "to 'clarify and to strengthen the Food and Drug Administration's legal authority

6    to require nutrition labeling on foods, and to establish the circumstances under which claims may

7    be made about the nutrients in foods.'" *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 223

8    (2d Cir.1998) (citing H.R.Rep. No. 101-538, at 7 (1990)).  "The NLEA amended the FDCA in

9    several significant respects: it expanded the coverage of nutrition labeling requirements; it

10   changed the form and substance of ingredient labeling on packages; it imposed limitations on

11   health claims; it standardized the definitions of all nutrient content claims; and it required more

12   uniform serving sizes." *Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG)(RML), 2010 WL

13   2925955, *3 (E.D.N.Y. July 21, 2010) (citing *The Impact of the Nutrition Labeling and

14   Education Act of 1990 on the Food Industry*, 47 ADMIN.L.REV. 605, 606 (1995)).  The NLEA

15   also added an express preemption provision to the FDCA.  See 21 U.S.C. § 343-1(a)(5) ("Except

16   as provided in subsection (b), no State or political subdivision of a State may directly or indirectly

17   establish under any authority or continue in effect as to any food in interstate commerce . . . any

18   requirement respecting any claim of the type described in section 343(r)(1) of this title, made in

19   the label or labeling of food that is not identical to the requirement of section 343(r) of this title").

20              **1.    Whether Briseno's Claims Are Preempted**

21        ConAgra argues that Briseno's claims are preempted because the Food and Drug

22   Administration has repeatedly concluded that bioengineered foods are not meaningfully different

23   from foods developed by traditional plant breeding, and thus that the fact that a food product is

24   derived from bioengineered plants need not be reflected on a product's label.[12]  As Briseno notes,

25   however, this misstates the issue.[13]  Briseno's primary argument is not that ConAgra was required

26   _____

27        [12]Motion at 5–6.

28        [13]Opposition at 9.

6

1   to state whether its products were made from genetically modified plants. Rather, he contends

2   that ConAgra's affirmative decision to label its products "100% Natural" was misleading, given

3   that the products were made from genetically modified plants.[14]

4          Several courts in this circuit have addressed similar issues. In *Lockwood v. Conagra

5   *Foods, Inc.*, 597 F.Supp.2d 1028 (N.D. Cal. Feb. 3, 2009), plaintiffs contended that ConAgra

6   misled the public by advertising its pasta sauce as "all natural," when in fact it contained high

7   fructose corn syrup. *Id.* at 1029. In reaching this result, the court rejected ConAgra's argument

8   that the claim was preempted by the NLEA. *Id.* at 1031. While the NLEA preempts claims that

9   product labeling fails to identify that the product contains artificial flavors, colors, or

10  preservatives, and claims that product labeling does not disclose that the product is an imitation

11  of another food, the court concluded that plaintiffs had not alleged such circumstances, and had

12  asserted only that the pasta sauce was "not 'all natural' because it is made with high fructose corn

13  syrup." *Id.*

14         Similarly, in *Wright v. General Mills, Inc.,* Civil No. 08cv1532 L(NLS), 2009 WL

15  3247148 (S.D. Cal. Sept. 30, 2009), plaintiff asserted that marketing "Nature Valley" crunchy

16  granola bar products as "100% Natural" was misleading, because the products contained high

17  fructose corn syrup. *Id.* at *1. The court concluded that plaintiff's deceptive advertising claims

18  were not preempted, noting that "[b]ecause the FDA has deferred taking regulatory action with

19  respect to the term 'natural,' plaintiff's state law claims do not stand as an obstacle to

20  accomplishing Congress's objectives of uniformity and consistency in regulating labeling." *Id.*

21  at *3; see also *Holk v. Snapple Beverage Corp.* 575 F.3d 329, 342 (3d Cir. 2009) (holding that

22  a claim predicated on defendant's use of the word "natural" was not preempted because "there

23  is no FDA policy with which state law could conflict"); *Astiana,* 2011 WL 2111796 at *10 (

---

[14]Briseno does request "[a]n order requiring defendant to adopt and enforce a policy that requires appropriate disclosure of GM ingredients." (Complaint at 15.) The court addresses this prayer for relief *infra*. The bulk of the complaint, however, alleges that use of the phrase "100% Natural" is misleading, and does not contend that additional information must be added to Wesson Oil labels.

1    claim that defendant misrepresented ice cream as being "all natural" when the alkalized cocoa

2    used in the product was processed with potassium carbonate, which was allegedly not natural, was

3    not preempted); *Hitt v. Arizona Beverage Co., LLC*, No. 08cv809 WQH (POR), 2009 WL

4    449190, *5 (S.D. Cal. Feb. 4, 2009) (claim that defendants deceptively promoted drinks as

5    "100% Natural" and "All Natural" when they contained high fructose corn syrup was not

6    preempted).

7         The court concurs with the result reached by these courts.   While the FDA has

8    acknowledged that "[t]he meaning and use of the term 'natural' on the label are of considerable

9    interest to consumers and industry," and that common uses of the term are "confusing and

10   misleading to consumers and frequently breach the public's legitimate expectations about their

11   meaning," 56 FR 60421-01, "[b]ecause of resource limitations and other agency priorities," the

12   agency has not engaged in rulemaking to establish a definition of the word.  58 FR 2302-01; see

13   also *Hitt*, 2009 WL 449190 at *3-4.

14        ConAgra asserts, however, that Briseno's claims are barred by 21 U.S.C.A. § 343 (i)(1),

15   which states that a food is misbranded unless its label bears "the common or usual name of the

16   food."[15]  Additionally, it suggests that the claims are preempted by 21 U.S.C. § 343(i)(2), which

17   requires that each product list its ingredients by their "common or usual name," and by

18   regulations requiring that vegetable oils be denominated "___ oil," 21 CFR § 101.4(b)(14).[16]

19   These provisions are inapplicable.  Briseno's central argument is not that ConAgra cannot use the

20   common or usual names of canola oil, vegetable oil or corn oil, or that ConAgra must modify the

21   list of ingredients on its labels.  Rather, he contends that labeling the oils "100% Natural" is

22   misleading.

23        The cases cited by ConAgra do not compel a different result.  In *Dvora v. General Mills,*

24   *Inc.*, No. CV 11-1074-GW(PLAx), 2011 WL 1897349 (C.D. Cal. May 16, 2011), plaintiff

25   alleged a number of violations of California law based on an allegation that the labeling and

26

27        [15]Motion at 11.

28        [16]*Id.* at 14.

8

advertising of defendant's "Total Blueberry Pomegranate" cereal was false and misleading. *Id.* at *1. The court noted that the FDA, through the FDCA and accompanying regulations, had implemented a comprehensive scheme that governed the labeling of flavors and flavoring in food products. These included requirements that products containing artificial flavoring state that fact; detailed requirements on how to characterize a flavor; and rules on how fruit could be depicted when used to reference the flavor of a product not actually containing the fruit. *Id.* at *4. The court concluded that plaintiff's claims were preempted, noting:

> "Defendant persuasively argues that Plaintiff's lawsuit seeks to impose requirements that are 'not identical' to this regulatory scheme. First, Plaintiff apparently seeks to forbid General Mills from labeling its product 'Total Blueberry Pomegranate,' even though such descriptions of 'characterizing flavor' are expressly authorized by federal law. Second, Plaintiff appears to demand that General Mills affirmatively state on the package that the cereal 'does not actually contain blueberries or pomegranates,' even though FDA regulations would not require this. Third, Plaintiff objects to the depiction of brown colored 'clusters' that (according to Plaintiff) allegedly 'resemble blueberries and/or pomegranate seeds,' even though FDA regulations would have permitted General Mills to depict even fresh blueberries and pomegranates on its box." *Id.*

Similarly, in *Turek v. General Mills, Inc.*, 754 F.Supp.2d 956 (N.D. Ill. 2010), the court determined that plaintiff's claim that General Mills misleadingly labeled snack bars and yogurt as rich in fiber, when in fact they contained non-natural fibers, was preempted by the NLEA. The court relied in part on the statute's "thorough regulation of fiber." *Id.* at 962. The *Turek* court contrasted the facts of the case with those in *Holk*, where the court determined that the NLEA did not preempt state consumer fraud claims based on Snapple Beverage Company's use of the term "natural" on its drinks. The *Turek* court noted that the decision in *Holk* rested in part on the court's conclusion that "the FDA contained no requirement regarding the term 'natural.'" *Id.* at 961 (citing *Holk*, 575 F.3d at 341).

The same is true of this court's recent decision in *Yumul v. Smart Balance, Inc.*, No. CV

10-00927 MMM (AJWx), 2011 WL 1045555 (C.D. Cal. Mar. 14, 2011).  There, the court's conclusion that claims were preempted depended heavily on the fact that "Yumul [sought] to enjoin Smart Balance from placing a 'No Cholesterol' label on its product – something the FDA regulations expressly permit Smart Balance to do. . . ."  Consequently, the court concluded, "a liability finding in this action would impose a requirement 'that is not identical' to federal law." *Id.* at *9; see also *Peviani v. Hostess Brands, Inc.*, 750 F.Supp.2d 1111, 1119 (C.D. Cal. 2010) ("The FDA regulations explicitly define the term '0 Grams of Trans Fat' and the NLEA expressly prohibits any state from directly or indirectly establishing any requirement that is not identical to the relevant federal requirements.  21 U.S.C. § 343-1(a)(5).  Plaintiff's claims seek to enjoin the use of the very term permitted by the NLEA and its accompanying regulations.  Plaintiff's claims must therefore fail because they would necessarily impose a state-law obligation for trans fat disclosure that is not required by federal law").  In contrast, ConAgra cites no provision in the FDCA nor any FDA regulation that concerns use of the phrase "100% Natural," or specifies that a product cannot be labeled "natural" despite being produced from genetically modified plants.

ConAgra argues that the FDA has repeatedly indicated that bioengineered foods are not meaningfully different from foods developed through traditional plant breeding.[17]  It cites a 2001 draft FDA report, which provided non-binding guidance on labeling "indicating whether foods have or have not been developed using bioengineering."[18]  The document reiterates the FDA's 1992 policy position that it "has no basis for concluding that bioengineered foods differ from other foods in any meaningful or uniform way, or that, as a class, foods developed by the new

---

[17]Motion at 4.

[18]Request for Judicial Notice, Docket No. 25 (August 24, 2011), Exh. A ("Guidance for Industry").  The court can judicially notice the document, which is non-binding regulatory guidance disseminated by a regulatory agency.  *Peviani*, 750 F.Supp.2d at 1116 ("Defendants request that the Court take judicial notice of the FDA Food Labeling Guide, which is a regulatory guideline disseminated by the FDA in order to provide nonbinding guidance regarding requirements for trans fat labeling.  The Court finds that the FDA Food Labeling Guide is a judicially noticeable document"); *Ries v. Hornell Brewing Co.*, No. 10-1139-JF (PVT), 2010 WL 2943860, *5 n. 3 (N.D. Cal. July 23, 2010) (taking judicial notice of a document on the FDA's website).

techniques present any different or greater safety concern than foods developed by traditional plant breeding."[19] ConAgra reads too much into the guidance, however, when it argues that "[p]laintiff in essence seeks to create a distinction – between 'natural' oils and those made from bioengineered plants – whe[n] the FDA has determined that no such distinction exists."[20] If anything, the guidance reinforces the view that a food producer's statement as to whether a product contains genetically modified ingredients can be misleading.  The guidance states that the "FDA recognizes that some manufacturers may want to use informative statements on labels and in labeling of bioengineered foods or foods that contain ingredients produced from bioengineered foods."[21]  It then addresses what terms can be used to convey accurate information, stating, for example, that "[t]erms like 'not genetically modified' and 'GMO free' that include the word 'modified' are not technically accurate unless they are clearly in a context that refers to bioengineering technology."[22]  As a result, the document does not support ConAgra's assertion that the FDA has concluded that there is no distinction between natural and bioengineered foods, or that statements concerning genetic modification, or the lack thereof, cannot be misleading.

Even if the document supported ConAgra's position, however, it would not be entitled to preemptive effect.  As the guidance makes clear, it is merely a non-binding draft distributed for comment purposes.[23]  The guidance was not the product of a formal administrative process suggesting fairness and deliberation by the agency; it therefore cannot be said to have the force of federal law.  See *Holk*,  575 F.3d at 342.

ConAgra does correctly note,[24] however, that Briseno seeks an order "requiring

---

[19]Guidance for Industry at 1.

[20]Motion at 15.

[21]Guidance for Industry at 2.

[22]*Id.* at 3.

[23]*Id.* at 1.

[24]Reply at 7.

[d]efendant to adopt and enforce a policy that requires appropriate disclosure of GM ingredients."[25] Congress and the FDA have thoroughly regulated the manner in which ingredients must be listed on packages, including specifying how oil products must be labeled. See, e.g., 21 U.S.C. § 343(i)(2); 21 CFR § 101.4(b)(14). Entering an order of the type Briseno seeks would impose a requirement that is not identical to federal law, and his prayer for such relief is thus preempted. As this is not the gravamen of his complaint, however, the court cannot accept ConAgra's argument that because Briseno has incuded this prayer for relief in the complaint all of his claims are preempted. Rather, only this aspect of the prayer is preempted.

### C.   Whether the Court Should Dismiss or Stay the Case Under the Doctrine of Primary Jurisdiction

As an alternate argument, ConAgra asserts that the court should dismiss or stay the action under the doctrine of primary jurisdiction. This doctrine "seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within a regulatory regime." *Pharmaceutical Research and Mfrs. of America v. Walsh*, 538 U.S. 644, 674 (2003) (Breyer, J., concurring); *Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.*, 307 F.3d 775, 780 (9th Cir. 2002) ("[I]t is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts."). As the *Syntec* court stated:

> "[P]rimary jurisdiction is properly invoked when a claim is cognizable in federal court but requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency. It is not . . . a doctrine that requires that all claims within an agency's purview to be decided by the agency. Nor is it intended to secure expert advice for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit." *Id.* (citations and quotation marks omitted).

---

[25]Complaint at 15.

12

1    Application of the doctrine is not appropriate here. "[V]arious parties have repeatedly

2   asked the FDA to adopt formal rulemaking to define the word natural and the FDA has declined

3   to do so because it is not a priority and the FDA has limited resources. Moreover, this is not a

4   technical area in which the FDA has greater technical expertise than the courts – every day courts

5   decide whether conduct is misleading." *Lockwood*, 597 F.Supp.2d at 1035; see also *Wright*, 2009

6   WL 3247148 at *3 ("Based on the FDA's consistent determination that the term 'natural' does

7   not need specific definition, state law claims based upon the use of the term 'natural' [do] not

8   [present] an issue of first impression, do[ ] not require technical expertise within the special

9   competence of the FDA, and [do] not [raise] a particularly complicated issue outside the ability

10  of the Court to consider and decide"). ConAgra's argument that the court should not "forego

11  the benefits of highly-developed agency experience and unique agency resources" is unavailing

12  when there is no indication that the FDA intends to provide guidance on use of the term "natural"

13  in the immediate future.[26] Accordingly, the court declines to dismiss or stay the action on this

14  basis.

15      **D.      Whether Briseno's Claims Satisfy Rules 8 and 9(b)**

16      ConAgra next contends that Briseno has failed to satisfy the pleading requirements of both

17  Rule 8(a)(2) and Rule 9(b) of the Federal Rules of Civil Procedure.[27] Under Rule 8(a)(2), a

18  pleading need contain only "a short and plain statement of the claim showing that the pleader is

19  entitled to relief." The more rigorous Rule 9(b) requires that, "[i]n all averments of fraud or

20  mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

21  FED.R.CIV.PROC. 9(b); see also 5A Charles A. Wright & Arthur W. Miller, FEDERAL PRACTICE

22  AND PROCEDURE § 1297 (2006) ("[Rule 9(b)] is a special pleading requirement [that is] contrary

23  to the general approach of the 'short and plain,' simplified pleading adopted by the federal

24  rules. . .").

25      "To avoid dismissal for inadequacy under Rule 9(b)," a "complaint [must] 'state the time,

26  _____

27      [26]Motion at 19.

28      [27]*Id.* at 20.

13

place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.'" *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (quoting *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1393 (9th Cir. 1989), and *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)); see also *In re GlenFed Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc).   Conclusory allegations are insufficient, and the facts constituting the fraud must be alleged with specificity. See *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ("A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer to the allegations.   While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient" (citation omitted)); see also *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (to satisfy Rule 9(b), "the complaint [must] identif[y] the circumstances of the alleged fraud so that defendants can prepare an adequate answer" (internal quotation marks omitted)).

"It is well-settled that the Federal Rules of Civil Procedure apply in federal court, 'irrespective of the source of the subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003)). Consequently, the Ninth Circuit has held that Rule 9(b)'s pleading requirements apply to claims under both the CLRA and the UCL:

> "The CLRA prohibits 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale . . . of goods or services to any consumer.' CAL. CIV. CODE § 1770.   The UCL prohibits 'unlawful, unfair or fraudulent business act[s] or practice[s]' and 'unfair, deceptive, untrue or misleading advertising.' CAL. BUS. & PROF. CODE § 17200.   Rule 9(b)'s particularity requirement applies to these state-law causes of action.   *Vess*, 317 F.3d at 1102-05.   In fact, we have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for violations of the CLRA and UCL." *Kearns*, 567 F.3d at 1125 (citing *Vess*, 317

14

1  F.3d at 1102-05).

2  While the Ninth Circuit acknowledged that "fraud [was] not a necessary element of a claim under

3  the CLRA and UCL," it noted that when a plaintiff alleges "fraudulent conduct and rel[ies]

4  entirely on that course of conduct as the basis of th[e] claim," then "the claim [can be] said to be

5  'grounded in fraud' or to 'sound in fraud,' and the pleading . . . as a whole must satisfy the

6  particularity requirement of Rule 9(b)." *Id.*   In addition, district courts in California have

7  consistently held that claims under California's FAL are grounded in fraud.   See, e.g., *Pom*

8  *Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 642 F.Supp.2d 1112, 1124 (C.D. Cal. 2009)

9  ("However, this Court agrees that Plaintiff's false advertising claims are 'grounded in fraud,'"

10 quoting *Vess*, 317 F.3d at 1103-04); *Germain v. J.C. Penney Co.*, No. CV 09-2847 CAS

11 (FMOx), 2009 WL 1971336, *3-4 (C.D. Cal. July 6, 2009) (concluding that false advertising

12 claims were grounded in fraud).   Briseno does not dispute that Rule 9(b) governs his pleading of

13 claims, as each alleges false advertising and false representations regarding the properties of

14 Wesson Oil.

15         As noted, to satisfy Rule 9(b), a complaint must plead "'the who, what, when, where, and

16 how' of the misconduct charged," *Vess*, 317 F.3d at 1106 (quoting *Cooper*, 137 F.3d at 627, and

17 further must "set forth what is false or misleading about a statement, and why it is false,"

18 *GlenFeld*, 42 F.3d at 1548.   In *Kearns*, the Ninth Circuit applied these standards to CLRA and

19 UCL claims alleging fraud in the sale of certified pre-owned ("CPO") vehicles.   Ford represented

20 that it put the vehicles through a rigorous inspection process to certify that their safety, reliability,

21 and road-worthiness surpassed those of non-certified used vehicles.  *Kearns*, 567 F.3d at 1122-23.

22 Ford promoted the program through print, broadcast, online, and other media; local dealerships

23 were responsible for the sale and servicing of the vehicles.  *Id.* at 1123.   Plaintiff asserted that

24 Ford made false and misleading statements concerning the safety and reliability of the vehicles.

25 Specifically, he alleged that Ford misrepresented the quality of the complete repair and accident-

26 history report, the level of training that inspecting technicians received, and the rigor of the

27 certification process.  *Id.*   Plaintiff contended that members of the putative class he sought to

28 represent were exposed to Ford's representations through its televised national marketing

1   campaign, sales materials at the dealership where they bought their vehicles, and sales personnel

2   working at the dealership. *Id.* at 1125-26. The Ninth Circuit, reviewing the complaint *de novo*,

3   held that the allegations were not pled with particularity as required by Rule 9(b):

4         "Kearns fails to allege in any of his complaints the particular circumstances

5         surrounding such representations. Nowhere in the [complaint] does Kearns specify

6         what the television advertisements or other sales material specifically stated. Nor

7         [does] Kearns specify when he was exposed to them or which ones he found

8         material. Kearns also fail[s] to specify which sales material he relied upon in

9         making his decision to buy a CPO vehicle. Kearns does allege that he was

10        specifically told 'CPO vehicles were the best used vehicles available as they were

11        individually hand-picked and rigorously inspected used vehicles with a Ford-backed

12        extended warranty.' Kearns does not, however, specify who made this statement

13        or when this statement was made. Kearns fail[s] to articulate the who, what, when,

14        where, and how of the misconduct alleged. The pleading of . . . neutral facts fails

15        to give Ford the opportunity to respond to the alleged misconduct. Accordingly,

16        these pleadings do not satisfy the requirement of Rule 9(b) that 'a party must state

17        with particularity the circumstances constituting fraud. . . .' Because Kearns failed

18        to plead his averments of fraud with particularity, we affirm the district court's

19        dismissal of his [complaint]." *Id.* at 1126.

20  Following the court's reasoning in *Kearns*, this court in *Yumul* concluded that plaintiff had not

21  satisfied Rule 9(b). It stated:

22        "Yumul has failed to allege when during the period from January 1, 2000 to the

23        present she saw or heard the particular representations upon which her complaint

24        is based. Although the complaint alleges that Yumul purchased Nucoa 'repeatedly'

25        during the class period, it does not allege with any greater specificity the dates on

26        which the purchases were made. Moreover, the complaint does not allege that

27        Nucoa packaging remained consistent throughout the decade, i.e., that Smart

28        Balance represented that the product contained no cholesterol and was healthy

(saludable) during the entire class period. Nor does the complaint allege that each time Yumul purchased the product, she saw one or both representations." *Yumul v. Smart Balance, Inc.*, 733 F.Supp.2d 1117, 1124 (C.D. Cal. 2010).

This case is similar to *Kearns* and *Yumul*. Briseno alleges that he

"regularly purchased Wesson Canola Oil for his own and his family's consumption, most recently in May 2011. Plaintiff believed Defendant's representation that Wesson Oil was 100% natural. Plaintiff would not have purchased Wesson Canola Oil, but for Defendant's misleading statements about the product being 100% natural. Plaintiff was injured in fact and lost money as a result of Defendant's conduct of improperly describing Wesson Oils as 'natural.' Plaintiff paid for a 100% natural product, but did not receive a product that was 100% natural. Plaintiff received a product that was genetically engineered in a laboratory, and had its genetic code artificially altered to exhibit not 'natural' qualities."[28]

While Briseno pleads that he relied on the company's representation that Wesson oils are "100% Natural," his complaint contains no allegations as to whether he became aware of the representation through ConAgra's advertising, its labeling or Wesson oils or both.[29] *Kearns*, 567 F.3d at 1126 ("Nor did Kearns specify when he was exposed to them or which ones he found material. Kearns also failed to specify which sales material he relied upon in making his decision to buy a CPO vehicle").

Briseno also provides no information about how often he was exposed to the allegedly misleading statement. *Yumul*, 733 F.Supp.2d at 1124. While Briseno alleges that "*[a]ll* Wesson Oils are sold with a label stating that the product is '100% Natural,'"[30] he does not allege how frequently he purchased the product and over what period of time,[31] whether he relied on

---

[28]Complaint, ¶ 11.

[29]*Id.*

[30]*Id.*, ¶ 13 (emphasis added).

[31]Briseno does mention one specific purchase in May 2011.

statements on canola oil labels, on ConAgra's website, in its advertisements, or all of the above,
whether the statements remained the same throughout the class period, or, if they did not, on
which label(s), advertisement(s) or statement(s) he relied.   Applying the standard set forth in
*Kearns*, the court concludes that Briseno has not alleged with particularity when, where, and how
the alleged misrepresentations were communicated to him.[32]

The court acknowledges that other courts appear to have applied Rule 9(b) less rigorously.
In *Chacanaca v. Quaker Oats Co.*, 752 F.Supp.2d 1111 (N.D. Cal. 2010), the court concluded
that consumers of granola bars had satisfied Rule 9(b) by identifying "the particular statements
they allege are misleading, the basis for that contention, where those statements appear on the
product packaging, and the relevant time period in which the statements were used. As such, they
have satisfied the requisite 'who, what, when, where, and how' of the misconduct charged." *Id.*
at 1126.   Similarly, in *Astiana*, the court concluded that plaintiffs had pled facts with sufficient
particularity because it could discern from their allegations that

"[t]he 'who' is Ben & Jerry's, Breyers, and Unilever. The 'what' is the statement

---

[32]In *Marolda v. Symantec Corp.*, 672 F.Supp.2d 992 (N.D. Cal. 2009), Judge Marilyn
Hall Patel of the Northern District of California offered a well-reasoned interpretation of *Kearns*
as it applies to omitted information. While Briseno alleges affirmative misrepresentations rather
than omissions, the court finds Judge Patel's opinion informative in assessing the level of detail
necessary to meet Rule 9(b)'s requirements:
> "In this case, to plead the circumstances of omission with specificity, plaintiff must
> describe the content of the omission and where the omitted information should or
> could have been revealed, as well as provide representative samples of
> advertisements, offers, or other representations that plaintiff relied on to make her
> purchase and that failed to include the allegedly omitted information. Plaintiff's
> complaint should also include samples of materials documenting both her 2006 and
> 2007 purchases that leave out the essential information." *Id.* at 1001.

See also *id.* at 1005 ("[P]laintiff must first identify with some specificity what the allegedly false
representations contained, who made them, where, and whether plaintiff had even seen them").
The plaintiff in Marolda alleged a precise date on which the product was purchased; as a result,
failure to plead this information was not a subject on which Judge Patel touched.

The court recognizes that the product at issue in *Marolda* is of a different type than the
consumer food product at issue here.   The court would not expect Briseno to be able to produce
and attach an exhibits to the complaint receipts for his purchases of Wesson Oils.   Nonetheless,
the court believes that some level of detail between that which Judge Patel required in *Marolda*
and that provided here (and endorsed in *Chacanaca* and *Astiana*) is required.

18

that ice cream containing alkalized cocoa is 'all natural.' The 'when' is alleged as 'since at least 2006,' and 'throughout the class period.' The 'where' is on the ice cream package labels. The 'how the statements were misleading' is the allegation that defendants did not disclose that the alkalizing agent in the alkalized cocoa was potassium carbonate, which plaintiffs allege is a 'synthetic.'" *Astiana*, 2011 WL 2111796 at *6.

The court is, of course, bound to apply *Kearns*, and it concludes, for the reasons stated above, that the general allegations Briseno makes about when he purchased the product, where he purchased it, and how he was made aware of ConAgra's representations about do not afford ConAgra adequate opportunity to respond. *Kearns*, 567 F.3d at 1126. Consequently, defendant's motion to dismiss Briseno's complaint is granted. Briseno may replead the claims in a manner that satisfied the particularity requirement of Rule 9(b).[33]

### F.   ConAgra's Final Arguments for Dismissal

While the court dismisses the complaint under Rule 9(b), it takes this opportunity to address ConAgra's additional arguments for dismissal. First, ConAgra asserts that "[w]idely accessible public information makes clear that 88-94% of the nation's crops of corn, soy and canola [are] grown from seeds that are the product of bioengineering."[34] It is unclear how the court could take judicial notice of this fact, or what the import of the statistic would be if it did. The fact that genetically modified foods are common does not indicate that identifying foods that are bioengineered as "natural" is not material to consumers. Indeed, the fact that Conagra has a specific line of products made entirely from non-bioengineered ingredients suggests that some consumers opt not to buy genetically engineered products, no matter how common they may be.[35]

The court is similarly unpersuaded by ConAgra's argument that the very existence of its Lightlife and organic lines – made entirely from ingredients that have not been biologically

---

[33]*Id.* at 15.

[34]Motion at 23.

[35]*Id.* at 24.

1   engineered – defeats Briseno's claim.[36]  The fact that Briseno knew about these product lines at

2   the time he filed his complaint does not compel the conclusion that he knew of them at the time

3   he purchased Wesson Oil.[37]

4        Nor is the court persuaded at this stage of the proceedings that Briseno's claims are so

5   implausible that they must be dismissed with prejudice.[38]  While courts have dismissed food

6   labeling claims on this basis, Briseno's allegations cannot readily be analogized to cases involving

7   consumers who were purportedly misled by the use of names such as "Cap'n Crunch with

8   Crunchberries" and "Froot Loops" into concluding that the cereals contained real fruit.

9   *Sugawara v. Pepsico, Inc.*, No. 2:08-cv-01335-MCE-JFM, 2009 WL 1439115, *1 (E.D. Cal.

10  May 21, 2009); *McKinnis v. Kellogg USA*, No. CV 07-2611 ABC (RCx),  2007 WL 4766060,

11  *1 (C.D. Cal. Sept. 19, 2007).  Briseno's claim that he was misled is not so dubious that the court

12  can resolve it as a matter of law.  Drawing, as it must, all reasonable inferences in favor of

13  plaintiff,  the court concludes that a reasonable consumer could have been misled by the labeling,

14  marketing, and advertising at issue in this case.

### III. CONCLUSION

17       For the reasons stated, the court grants defendant's motion to dismiss.  Plaintiff's prayer

18  for an order requiring ConAgra to adopt and enforce a policy that requires appropriate disclosure

19  of genetically modified ingredients is preempted.  Accordingly, that prayer may not be included

20  in any amended complaint.  With that exception, Briseno may file an amended complaint within

21  twenty (20) days of the date of this order.

23  DATED: November 7, 2011

                                 MARGARET M. MORROW
24                                   UNITED STATES DISTRICT JUDGE

26  [36]*Id.*

27  [37]Complaint, ¶ 18.

28  [38]Motion at 24.